State v. Philip Morris USA, Inc., 2006 NCBC 22

| | | |
|---|---|---|
| STATE OF NORTH CAROLINA | | IN THE GENERAL COURT OF JUSTICE |
| | | SUPERIOR COURT DIVISION |
| COUNTY OF WAKE | | 98 CVS 14377-I |

| | | |
|---|---|---|
| STATE OF NORTH CAROLINA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PHILIP MORRIS USA, INC.; R.J. | ) | |
| REYNOLDS TOBACCO COMPANY; | ) | ORDER ON DEFENDANTS' MOTION |
| BROWN & WILLIAMSON TOBACCO | ) | TO COMPEL ARBITRATION |
| COMPANY, Individually and as successor | ) | |
| by merger to The American Tobacco | ) | |
| Company; and LORILLARD TOBACCO | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

{1}     This case arises under the Master Settlement Agreement, to which Plaintiff State of North Carolina and the Defendant tobacco companies are parties.  This matter comes before the Court on Defendants' Motion to Compel Arbitration and to Dismiss or, in the Alternative, Stay this Litigation.

{2}     After considering the briefs and oral arguments, the Court GRANTS Defendants' Motion to Compel Arbitration on the grounds that:  (1) the present dispute between the State of North Carolina and the tobacco companies is arbitrable under the plain language of the Master Settlement Agreement, (2) the courts of North Carolina and the United States have established a strong presumption in favor of arbitration, and (3) arbitration is the most fair and practical vehicle for resolution of payment disputes under the unitary payment structure set forth in the Master Settlement Agreement.  All litigation on Plaintiff's Motion for Declaratory Order is hereby stayed pending arbitration of the payment dispute.

*Office of the Attorney General by Buren R. Shields, III and Melissa L. Trippe for Plaintiff State of North Carolina.*

*Manning, Fulton & Skinner, P.A. by Michael T. Medford and Judson A. Welborn; DLA Piper Rudnick Gray Cary US LLP by Charles Wayne; Winston & Strawn LLP by Thomas J. Frederick for Defendant Philip Morris USA, Inc.*

*Womble Carlyle Sandridge & Rice, PLLC by Burley B. Mitchell, Jr., Thomas D. Schroeder, and W. David Edwards; Kirkland & Ellis LLP by Stephen R. Patton for Defendant R.J. Reynolds Tobacco Company.*

*Brooks Pierce McLendon Humphrey & Leonard, LLP by Jim W. Phillips, Jr. and Andrew J. Haile; Weil, Gotshal & Manges LLP by Penny Reid and Idit Froim for Defendant Lorillard Tobacco Company.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P. by Mark A. Ash; Howrey LLP by Robert J. Brookhiser and Elizabeth B. McCallum for Intervenors Commonwealth Brands, Inc.,*

*Liggett Group LLC, Sherman's 1400 Broadway N.Y.C., Ltd., Farmer's Tobacco Co. of Cynthiana, Inc., Japan Tobacco International U.S.A., Inc., King Maker Marketing, Inc., Kretek International, Inc., Liberty Brands, LLC, P.T. Djarum, Santa Fe Natural Tobacco Company, Top Tobacco, L.P., Vector Tobacco, Inc., Vibo Corporation d/b/a General Tobacco, Van Eicken Group, Compania Industrial de Tabacos Monte Paz, SA, Daughters & Ryan, Inc., House of Prince A/S, Peter Stokkebye Tobaksfabrik A/S, and Virginia Carolina Corporation, Inc. (Subsequent Participating Manufacturers).*

Tennille, Judge.

# I.
## FACTUAL AND PROCEDURAL BACKGROUND
### A.
### THE PARTIES

{3}     Defendant Philip Morris USA, Inc. ("Philip Morris") is a corporation organized and existing under the laws of the Commonwealth of Virginia with its principal place of business in Richmond, Virginia. Philip Morris is a subsidiary of Altria Group, Inc.

{4}     Defendant R.J. Reynolds Tobacco Company ("R.J. Reynolds") (individually and as successor to R.J. Reynolds Tobacco Company and Brown & Williamson Tobacco Company ("Brown & Williamson")) is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business in Winston-Salem, North Carolina. R.J. Reynolds is an indirect wholly owned subsidiary of Reynolds American, Inc.

{5}     Defendant Lorillard Tobacco Company ("Lorillard") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Greensboro, North Carolina.

{6}     Defendants manufacture, advertise, promote, and sell cigarettes and other tobacco products.

### B.
### TOBACCO LITIGATION IN THE UNITED STATES

{7}     On September 30, 1950, British epidemiologists Richard Doll and A. Bradford Hill published an article in the *British Medical Journal* linking smoking to lung cancer and heart disease. *See* Richard Doll & A. Bradford Hill, *Smoking and Carcinoma of the Lung: Preliminary Report*, 2 Brit. Med. J. 739 (1950). By the mid-1950s, private citizens in the United States began to sue the companies responsible for manufacturing and marketing tobacco cigarettes for damages related to the effects of smoking. Between 1954 and 1994, there were approximately 813 claims brought against tobacco companies by private citizens in state courts across the country. Arthur B. LaFrance, *Tobacco Litigation: Smoke, Mirrors and Public Policy*, 26 Am. J.L. & Med. 187, 190 (2000). The private plaintiffs asserted claims for negligent manufacture, negligent advertising, fraud, and violation of various state consumer protection statutes. *Id.* at 191.

{8}     For forty years, the tobacco companies enjoyed great success in these private lawsuits. *Id.* Professor LaFrance reports that only two plaintiffs ever prevailed, and both of those decisions were later reversed on appeal. *Id.* at 190. By the late 1990s, the failure of private litigation gave rise to a new strategy. In 1997 the attorneys general of all fifty states began asserting public causes of action against the tobacco companies. *Id.* at 195. While armed with theories similar to those of the unsuccessful private plaintiffs, the states also brought claims for consumer fraud, racketeering, and reimbursement of Medicaid funds expended on smoking related illnesses. *Id.*

{9} The tobacco companies settled their disputes with Florida, Mississippi, Texas, and Minnesota on an individual, state-by-state basis. *Id.* In 1998 the remaining forty-six states, along with the District of Columbia, Puerto Rico, and five U.S. territories (collectively "Settling States") entered into a Master Settlement Agreement ("MSA") with the four largest tobacco manufacturers—Philip Morris, R.J. Reynolds, Brown & Williamson[1], and Lorillard. (Pl.'s Mot. Declaratory Order ¶ 1.) These companies comprise a group known as the original participating manufacturers ("OPMs"). The MSA permits other tobacco companies to join and agree to its terms. To date, more than forty of these subsequent participating manufacturers ("SPMs") have signed on to the agreement. (*Id.* ¶ 2.) Together, the OPMs and SPMs are known as "Participating Manufacturers."

{10} Under the MSA, the Settling States released the Participating Manufacturers from past, present, and future claims based on the harmful health effects of smoking. In return, the Participating Manufacturers promised to (1) make perpetual payments to the states as compensation for smoking-related medical costs, (2) fund the American Legacy Foundation, an antismoking advocacy group, and (3) adhere to certain restrictions on advertising, marketing, and other practices. (*Id.* ¶ 1.)

{11} The State of North Carolina entered into the MSA along with the other Settling States on November 16, 1998.

## C.

## THE PRESENT DISPUTE

## 1.

## THE NON-PARTICIPATING MANUFACTURER ADJUSTMENT

{12} On April 15 of each year, the MSA directs the Participating Manufacturers to each make a single payment into an escrow account. MSA § IX(c)(1). That payment is then divided among the settling states, according to each state's "allocable share." *Id.* § II(f). The amount of the payment is calculated by an "Independent Auditor." *Id.* § XI(a)(1). The Independent Auditor must be "a major, nationally recognized, certified public accounting firm." *Id.* § XI(b). The current Independent Auditor is PricewaterhouseCoopers. (Defs.' Mem. Supp. Mot. Compel Arbitration 6.)

{13} The Participating Manufacturers' annual payments are subject to several adjustments. MSA § IX(c)(2). One of these adjustments is called the Non-Participating Manufacturer ("NPM") Adjustment. The NPM Adjustment allows for a potential reduction in the amount owed by the Participating Manufacturers to the Settling States under the MSA. In order for the NPM Adjustment to apply, two conditions must be met. First, the manufacturer must suffer a "market share loss." *Id.* § IX(d)(1)(A). A market share loss occurs if the Participating Manufacturer's share of the U.S. cigarette market declines from one year to the next. *See id.* § IX(d)(1)(B)(i)–(iii). Second, an economic consulting firm must determine that "the disadvantages experienced as a result of the provisions of [the MSA] were a significant factor contributing to the Market Share Loss." *Id.* § IX(d)(1)(C). If these two requirements are met, a participating manufacturer may be entitled to reduce its payment for a particular year.

{14} However, there are ways for Settling States to avoid a reduction in payments due to the NPM Adjustment. Under section IX(d)(2)(B), the NPM Adjustment will not apply if the Settling State had a "Qualifying Statute" in place for the entire year preceding the time when the payment became due and "diligently enforced" the provisions of that statute. A Qualifying Statute "effectively and fully neutralizes the cost disadvantages that the Participating Manufacturers experience vis-à-vis Non-Participating Manufacturers." *Id.* § IX(d)(2)(B).

{15}     North Carolina's Qualifying Statute is codified at N.C. Gen. Stat. §§ 66-290 and 66-291. Section 66-291 requires any tobacco manufacturer selling cigarettes within the State to either join the MSA or pay a certain amount of money into escrow based on the number of product units sold in North Carolina. N.C. Gen. Stat. § 66-291(a) (2005).

{16}     The NPM adjustment is a recognition by the drafters of the MSA that the payments and other obligations incurred by the Participating Manufacturers is likely to put them at a competitive disadvantage relative to those manufacturers who did not join the agreement. It thus attempts to level the playing field by reducing a Participating Manufacturer's payment obligations for any year in which it can be proven that market share was actually lost to Non-Participating Manufacturers. Without such an adjustment, there would be a strong incentive not to participate in the MSA.

2.

## THE ARBITRATION CLAUSE AND THE ROLE OF THE INDEPENDENT AUDITOR

{17}     The drafters of the MSA were sophisticated parties who wisely foresaw conflict between the Settling States and the Participating Manufacturers over the amount of payments and adjustments. Section XI(c) thus requires:

> [A]ny dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor (including, without limitation, any dispute concerning the operation or application of any of the adjustments, reductions, offsets, carry-forwards and allocations described in subsection IX(j) or subsection XI(i)) shall be submitted to binding arbitration before a panel of three neutral arbitrators, each of whom shall be a former Article III federal judge.

MSA § XI(c). The parties further agreed that "[t]he arbitration shall be governed by the United States Federal Arbitration Act." *Id.*

{18}     Every year, the Independent Auditor collects information from the parties upon which to base its calculations of the amount owed by the Participating Manufacturers and the amount to be allocated to each Settling State. *Id.* § XI(d)(1). The Independent Auditor then issues a preliminary calculation. *Id.* § XI(d)(2). If a Participating Manufacturer or Settling State disagrees with "any aspect" of the preliminary calculations, it may serve notice of its objections upon the other parties. *Id.* § XI(d)(3). The Independent Auditor reviews the objections and issues a "Final Calculation," which must include an explanation of any changes made to the Preliminary Calculation. *Id.* § XI(d)(4). The parties may then serve notice of any objections they have to the Final Calculation. *Id.* § XI(d)(6).

{19}     The Participating Manufacturers are obligated to remit any portion of their total payment that is not in dispute. *Id.* § XI(d)(7). Any disputed amount is to be deposited into a "Disputed Payments Account." *Id.* § XI(d)(8). Failure to pay the undisputed amount renders a Participating Manufacturer liable for interest on that amount. *Id.* § XI(d)(7). Amounts deposited into the Disputed Payments Account are not subject to this penalty. *Id.* § XI(d)(8).

3.

## DISPUTE OVER THE 2003 NPM ADJUSTMENT

{20}     The dispute currently before the Court involves the annual payment that became due on April 17, 2006. Pursuant to the NPM Adjustment provisions discussed above, the economic consulting firm concluded that the MSA was a "significant factor" contributing to the Participating Manufacturers' 2003 Market Share Loss. (Defs.' Mem. Supp. 11.) Thus, the Participating Manufacturers were entitled to the NPM Adjustment unless North Carolina had a Qualifying Statute in effect and diligently enforced that statute for the year preceding the payment due date. *See* MSA § IX(d)(2)(B). Armed with these

determinations by the economic consulting firm, the OPMs requested that the Independent Auditor apply the NPM Adjustment to the payments due on April 17, 2006. (Defs.' Mem. Supp. 11.) The Settling States, understandably averse to any reduction in the amount owed them, urged the Independent Auditor to reject the OPMs' request. (*Id.*)

{21} In its notice of final calculation issued on March 29, 2006, the Independent Auditor stated that it "would not modify its current approach to the application of the NPM Settlement Adjustment." Letter from Theodore F. Martens, Independent Auditor to the Master Settlement Agreement, to Notice Parties (Mar. 29, 2006) (Defs.' Mem. Supp. Ex. J at 5). The Independent Auditor's "current approach" to the NPM Adjustment is memorialized in its notice of preliminary calculation issued on March 5, 2004. In early 2004, the Independent Auditor requested information from the National Association of Attorneys General ("NAAG") regarding Qualifying Statutes in the Settling States. In response, the NAAG informed the Independent Auditor that all the Settling States had enacted Model Statutes[2] which they represented to have been in full force and effect. Based on this information, the Independent Auditor concluded that "no possible NPM adjustment is allocated to PMs." Letter from Theodore F. Martens, Independent Auditor to the Master Settlement Agreement, to Notice Parties (Mar. 5, 2004) (Defs.' Mem. Supp. Ex. K at 2 n.1). The Independent Auditor, having found that each Settling State had a Qualifying Statute in force, effectively presumed that each Settling State had diligently enforced that statute as required by section IX(d)(2)(B) of the MSA.

{22} The OPMs served notice that they objected to the Independent Auditor's Final Calculation on April 10, 2006, and requested that North Carolina and other Settling States arbitrate the dispute over the applicability of the NPM Adjustment. (Defs.' Mem. Supp. 10–11.) On May 1, 2006, North Carolina refused to enter into arbitration proceedings. (*Id.*)

{23} On April 20, 2006, North Carolina filed a Motion for Declaratory Order, moving this Court to declare that (1) North Carolina had a Qualifying Statute in effect during 2003 and diligently enforced the statute during that year, (2) North Carolina is not subject to the NPM Adjustment for 2003, and (3) the Participating Manufacturers may not withhold payments or deposit them into the Disputed Payments Account based on the applicability of the NPM Adjustment for 2003. (Pl.'s Mot. Declaratory Order 1.)

{24} On May 15, 2006, the OPMs responded with a Motion to Compel Arbitration and to Dismiss or, in the Alternative, Stay this Litigation. The OPMs' motion asks the Court to Order the parties to arbitrate the dispute regarding the NPM Adjustment in accordance with the MSA's arbitration provision and North Carolina and federal law. (Defs.' Mot. Compel Arbitration 5.)

{25} By Joinder dated May 15, 2006, the SPMs joined the OPMs' Motion to Compel Arbitration. (SPMs' Joinder in OPMs' Mot. Compel Arbitration 6.) The NPM Adjustment for the SPMs is set forth separately from the provisions applicable to the OPMs. *See* MSA § IX(d)(4). However, the issues relevant here will not be affected by these slight differences.

II.

MOTION TO COMPEL ARBITRATION

The issue before the Court is one of contract interpretation. Based on (1) the plain language of the parties' agreement, (2) public policy favoring arbitration, and (3) considerations of fairness and practicality, the Court grants Defendants' Motion to Compel Arbitration.

A.

PLAIN LANGUAGE

{26}    The MSA is a contract between the Settling States and the Participating Manufacturers.   The guidelines this Court must follow in interpreting this or any other contract are well known.   "The heart of a contract is the intention of the parties, which is ascertained by the subject matter of the contract, the language used, the purpose sought, and the situation of the parties at the time." *Pike v. Wachovia Bank & Trust Co.*, 274 N.C. 1, 11, 161 S.E.2d 453, 462 (1968); *see also* 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 7.10 (2d ed. 1998) ("The overarching principle of contract interpretation is that the court is free to look to all the relevant circumstances surrounding the transaction.")   If the terms of a contract are unambiguous, the Court will determine their legal effect and enforce the agreement as written by the parties. *See, e.g.*, *Church v. Hancock*, 261 N.C. 764, 766, 136 S.E.2d 81, 83 (1964).

{27}    Although the Court is free to look beyond the language of the agreement, the words chosen by the parties after careful negotiation are most helpful in ascertaining their intentions.   At issue here is whether the parties' dispute over the applicability of the NPM Adjustment falls within the arbitration clause.   The arbitration clause is found in section XI of the MSA, which deals with "calculation and disbursement of payments."   Section XI(c), entitled "resolution of disputes," states as follows:

> [A]ny dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor (including, without limitation, any dispute concerning the operation or application of any of the adjustments, reductions, offsets, carry-forwards and allocations described in subsection IX(j) or subsection XI(i)) shall be submitted to binding arbitration before a panel of three neutral arbitrators, each of whom shall be a former Article III federal judge. . . . The arbitration shall be governed by the United States Federal Arbitration Act.

MSA § XI(c).

{28}    This matter involves a decision by the Independent Auditor not to apply the NPM Adjustment because it found that North Carolina (and all other Settling States) had a Qualifying Statute in effect and effectively presumed that the statute had been diligently enforced during the year preceding the payment due date.   The Participating Manufacturers are directly disputing a determination made by the Independent Auditor not to apply the NPM Adjustment.   This controversy thus falls squarely within the language of the arbitration clause.

{29}    Further support for this conclusion can be found in the language of the parenthetical phrase, which gives examples of the types of disputes covered by the arbitration clause.   Arbitrable disputes include "any dispute concerning the operation or application or any of the adjustments . . . described in subsection IX(j)."   MSA § XI(c).   Subsection IX(j) describes how payments are to be calculated.   First, a "base amount" is determined.   Then, various adjustments are applied to the base amount, in the order in which they appear in subsection IX(j).   The NPM Adjustment is the sixth step in the process.   MSA § IX(j).   The NPM Adjustment is clearly an adjustment "described in subsection IX(j)," and "any dispute" concerning the NPM Adjustment is subject to arbitration under section XI(c).

{30}    The language of section XI(c)'s arbitration clause is very broad.   It not only encompasses "any" dispute over the Independent Auditor's calculations or determinations, it also includes disputes "arising out of or relating to" those calculations.   The law directs this Court to ascertain the intentions of contracting parties based in part upon the language used in the contract.   It is difficult to conceive of broader language than that used in section XI(c).   The parties' words reveal an intention to subject a wide category of controversies to binding arbitration.   Faced with similar language in other contracts, the federal courts have reached the same conclusion.   In *Collins & Aikman Products Co. v. Building Systems, Inc.*, 58

F.3d 16 (2d Cir. 1995), the United States Court of Appeals for the Second Circuit examined an agreement which submitted to arbitration "any claim or controversy arising out of or relating to the agreement." 58 F.3d at 20. The court found that this was "the paradigm of a broad [arbitration] clause." *Id.* In 1997, the Eighth Circuit considered an "arising out of or relating to" arbitration clause and found it to be "the broadest language the parties could reasonably use to subject their disputes to that form of settlement, including collateral disputes that related to the agreement containing the clause." *Fleet Tire. Serv. of N. Little Rock v. Oliver Rubber Co.*, 118 F.3d 619, 621 (8th Cir. 1997).

{31} Here, the parties to the MSA used the broadest language they possibly could, and this Court will enforce the terms of the agreement as plainly written by the parties. *See Church*, 261 N.C. at 766, 136 S.E.2d at 83 ("Where the terms are plain and explicit the court will determine the legal effect of a contract and enforce it as written by the parties.").

{32} The State asserts that it did not agree to arbitrate the issue of "diligent enforcement."[3] (Pl.'s Resp. Defs.' Mot. Compel Arbitration 6.) Citing *Sloan Financial Group, Inc. v. Beckett*, 159 N.C. App. 470, 583 S.E.2d 325 (2003), the State argues that the present dispute does not concern a determination made by the Independent Auditor, but rather presents the issue of whether North Carolina diligently enforced its Qualifying Statute. (Pl.'s Resp. at 10.) According to the State, only this Court may properly decide whether "diligent enforcement" has occurred. (*Id.*)

{33} The events leading up to this dispute and the language of the MSA make the State's argument unpersuasive. The issues of diligent enforcement and the applicability of the NPM Adjustment are inextricably linked. Here, the only barrier to the application of the NPM Adjustment is whether the State diligently enforced its Qualifying Statute. As noted above, the Independent Auditor found that all Settling States had Qualifying Statutes in place and then refused to alter its stance on the applicability of the NPM Adjustment, effectively presuming that each Settling State "diligently enforced" its statute. *See supra* ¶ 17. The State cannot escape the simple fact that this presumption of diligent enforcement was a determination on the part of the Independent Auditor and is therefore subject to arbitration under section XI(c). At the very least, the Independent Auditor's presumption of diligent enforcement is "related to" its determination not to apply the NPM Adjustment.[4]

## B.

### PUBLIC POLICY IN FAVOR OF ARBITRATION

{34} The language of the agreement discussed in the preceding section must also be read in light of relevant public policy considerations. This Court has noted that caution is warranted whenever "public policy" comes into play. *See CNC/Access, Inc. v. Scruggs*, 2006 NCBC 20 ¶ 52 (N.C. Super. Ct. Nov. 15, 2006), http://www.ncbusinesscourt.net/opinions/2006%20NCBC% 2020.htm. But here there is a clear policy at both the state and federal levels in favor of arbitration.

{35} This Court has previously recognized North Carolina's "strong public policy favoring resolution of disputes through arbitration." *Polo Ralph Lauren Corp. v. Gulf Ins. Co.*, 2001 NCBC 3 ¶ 11, (N.C. Super. Ct. Jan. 31, 2001), http://www.ncbusinesscourt.net/opinions/ 2001%20NCBC%203.htm (quoting *Smith v. Young Moving & Storage, Inc.*, 141 N.C. App. 468, 470–71, 540 S.E.2d 383, 385 (2000)). The Supreme Court summarized the policy as follows: "Any doubt concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Cyclone Roofing Co. v.*

*LaFave Co.*, 312 N.C. 224, 229, 321 S.E.2d 872, 876 (1984).

{36}   The federal courts have recognized such a policy in favor of arbitration in the context of the Federal Arbitration Act ("FAA"), 9 U.S.C.S. §§ 1–307 (LEXIS through 2006 legislation).  This is relevant to the case at bar because section XI(c) of the MSA states that "[t]he arbitration shall be governed by the United States Federal Arbitration Act."  More than forty years ago, Justice William O. Douglas wrote that a motion to compel arbitration under the FAA "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. *United Steel Workers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83 (1960).

{37}   As demonstrated above, the arbitration clause in section XI(c) is susceptible of an interpretation that covers the present dispute over diligent enforcement.  Moreover, twenty-two of the twenty-three jurisdictions that have considered this same matter have decided in favor of arbitration.[5]   In a case such as this, where a question has been raised as to the arbitrability of a particular dispute, the Court must read the agreement in light of the strong state and federal policies in favor of arbitration.  Guided by the directives of the Supreme Court of the United States and the Supreme Court of North Carolina, this Court reads section XI(c) of the MSA to cover the present dispute.

C.

PRACTICALITY, FAIRNESS, AND THE STRUCTURE OF MSA

{38}   In general, this Court has "exclusive jurisdiction for the purposes of implementing and enforcing" the MSA.  MSA § VII(a).  Section XI(c) is an exception to this rule, providing that some disputes must be submitted to binding arbitration before a panel of three former Article III federal judges.  Pursuant to the analysis presented above, the Court has determined that this matter falls within section XI(c) and therefore must be submitted to the arbitration panel.

{39}   In addition to the plain language and public policy justifications, this result is the most practical and fair in terms of the MSA's nationwide payment obligations.  The Participating Manufacturers do not make fifty-two separate payments each year.  Rather, they make one payment based on their share of the U.S. tobacco market.  *Id*. § IX(c)(1).  The NPM Adjustment is applied to a Participating Manufacturer's nationwide payment obligation.  *Id*. § IX(j).  If the type of dispute presented here were not subject to arbitration, it would be subject to fifty-two separate determinations.  This raises the possibility of conflicting decisions that would frustrate the efforts of the Independent Auditor and render the entire payment process impractical.

{40}   Furthermore, a decision by this Court on whether North Carolina diligently enforced its Qualifying Statute would have an impact far beyond the borders of this state.  If the Independent Auditor determines that the NPM Adjustment is to apply in a given year, the Participating Manufacturers are entitled to reduce their nationwide payment obligation.  If this Court were to subsequently declare that North Carolina has diligently enforced its Qualifying Statute, then payments to North Carolina could not be reduced.  However, the amount of the nationwide NPM Adjustment would remain unchanged and would have to be reallocated to other Settling States that did not diligently enforce their Qualifying Statutes.  Each state thus has an incentive to have its home courts declare that diligent enforcement has occurred.

{41}   This potential conflict is obviated by the arbitration panel.  Before three former federal judges, no party will have the benefit of a real or imagined home court advantage, and the potential influence of state politics and other matters is avoided.  This Court agrees with Connecticut's assessment:

> [Arbitration] was one particularly effective way of ensuring . . . that all disputes, controversies and claims concerning the calculation and determination of payments under this massive, vitally important settlement agreement be resolved under one clear set of rules that apply with equal force to every Settling State and are fairly articulated after a process in which all affected such parties can meaningfully participate.

*State v. Philip Morris, Inc.*, No. CV960148414S, 2005 Conn. Super. LEXIS 2067, at *114 (Conn. Super. Ct. Aug. 3, 2005), *aff'd* 2006 Conn. LEXIS 322 (Conn. Sept. 12, 2006). As Judge Sheldon further observed, the consequence of not sending this dispute to arbitration would be "full employment for lawyers but little else." *Id.* at *114–15.

## III.

## CONCLUSION

{42} Based upon the foregoing, it is hereby ORDERED, ADJUDGED, and DECREED that Defendants' Motion to Compel Arbitration is granted. The parties shall submit their dispute to the arbitration panel as provided in section XI(c) of the MSA. Further litigation on Plaintiff's Motion for Declaratory Order is hereby stayed pending arbitration.

{43} The Supreme Court of North Carolina is likely to have the final word on this issue. As this Court has previously noted, the decision to grant a writ of petition for discretionary review lies exclusively with the Supreme Court. *State v. Philip Morris USA Inc.*, 2004 NCBC 9 ¶ 113 n.31 (N.C. Super. Ct. Dec. 23, 2004), http://www.ncbusinesscourt.net/120945/2004%20NCBC% 209.htm, *rev'd* 359 N.C. 763, 618 S.E.2d 219 (2005). This Court can only express its views that the issues decided here are of "significant public interest" warranting certification for review by the Supreme Court without delay. *See* N.C. Gen. Stat. § 7A-31(a)–(b).

IT IS SO ORDERED, this the 4th day of December, 2006.

## Appendix A

The following jurisdictions have granted Defendants' Motion to Compel Arbitration:

| | |
|---|---|
| Connecticut | *State v. Philip Morris, Inc.*, No. CV960148414S, 2005 Conn. Super. LEXIS 2067 (Conn. Super. Ct. Aug. 3, 2005), *aff'd*, 905 A.2d 42 (Conn. 2006). |
| New York | *State v. Philip Morris, Inc.*, 813 N.Y.S.2d 71 (N.Y. App. Div. 2006) (reversing trial court's order denying motion to compel arbitration), *motion to clarify denied, State v. Philip Morris, Inc.*, Motion No. M-2631 (N.Y. App. Div. July 13, 2006). |

| | |
|---|---|
| New Hampshire | *State v. Philip Morris USA*, No. 06-E-132 (N.H. Super. Ct. June 6, 2006), *motion to reconsider denied*, *State v. Philip Morris USA*, No. 06-E-132 (N.H. Super. Ct. July 17, 2006). |
| Kentucky | *Commonwealth ex rel. Stumbo v. Brown & Williamson Tobacco Corp.*, No. 98-CI-01579 (Ky. Cir. Ct. June 13, 2006). |
| Massachusetts | *Commonwealth v. Philip Morris, Inc.*, No. MICV1995-07378-F (Mass. Super. Ct. June 20, 2006). |
| Idaho | *State ex rel. Wasden v. Philip Morris, Inc.*, No. CV-OC-97-03239D (Idaho Dist. Ct. June 30, 2006), *motion to reconsider denied*, *State ex rel. Wasden v. Philip Morris, Inc.*, No. CV-OC-97-03239D (Idaho Dist. Ct. Aug. 2, 2006). |
| Vermont | *State v. Philip Morris USA, Inc.*, No. S 0463-06 CnC (Vt. Super. Ct. July 14, 2006). |
| Colorado | *State ex rel. Suthers v. R.J. Reynolds Tobacco Co.*, No. 97 CV 3432 (Colo. Dist. Ct. July 19, 2006). |
| Hawaii | *State ex rel. Bennett v. Philip Morris USA*, No. 06-1-0695-04 KSSA (Haw. Cir. Ct. Aug. 2, 2006). |
| Nevada | *State ex rel. Chanos v. Philip Morris USA*, No. CV06-00929 (Nev. Dist. Ct. Aug. 4, 2006). |
| Illinois | *State v. Philip Morris, Inc.* No. 96 L 13146 (Ill. Cir. Ct. Aug. 8, 2006). |
| Virginia | *Commonwealth ex rel. McDonnell v. Brown & Williamson Tobacco Corp.*, No. HJ-2241 (Va. Cir. Ct. Aug. 9, 2006). |
| Iowa | *State ex rel. Miller v. Philip Morris USA, Inc.*, No. CL 71048 (Iowa Dist. Ct. Aug. 16, 2006). |
| California | *State v. Philip Morris USA, Inc.*, No. JCCP 4041 (Cal. Super. Ct. Aug. 23, 2006). |
| Nebraska | *State ex rel. Bruning v. R.J. Reynolds Tobacco Co.*, No. CI 06-1656 (Neb. Dist. Ct. Aug. 28, 2006). |
| Oregon | *State v. Philip Morris USA*, No. 0604-04252 (Or. Cir. Ct. Aug. 30, 2006). |
| Ohio | *State ex rel. Petro v. R.J. Reynolds Tobacco Co.*, No. 97CVH05-5114 (Ohio Ct. Com. Pl. Sept. 25, 2006). |
| District of Columbia | *District of Columbia v. Phillip Morris USA, Inc.*, No. 2006 CA 003176 B (D.C. Super. Ct. Sept. 26, 2006). |
| Michigan | *State ex rel. Cox v. Philip Morris USA*, No. 06-539-CZ (Mich. Cir. Ct. Sept. 28, 2006). |
| Washington | *State v. Philip Morris USA, Inc.*, No. 06-2-13262-9SEA (Wash. Super. Ct. Sept. 28, 2006). |
| South Dakota | *State v. R.J. Reynolds Tobacco Co.*, No. 06-161 (S.D. Cir. Ct. Oct. 2, 2006). |
| Maine | *State v. Philip Morris, Inc.*, No. CV-97-134 (Me. |

## Appendix B

The following state has denied Defendants' Motion to Compel Arbitration:

| | |
|---|---|
| North Dakota | *State ex rel. Stenehjem v. Philip Morris, Inc.*, No. 09-98-C-03778 (N.D. Dist. Ct. July 18, 2006). |

---

[1] Brown & Williamson combined its U.S. operations with R.J. Reynolds in 2004.

[2] One of the exhibits to the MSA is a "Model Statute." MSA Ex. T. The Participating Manufacturers and Settling States agreed that if the Model Statute was enacted "without modification or addition," it would constitute a Qualifying Statute for purposes of determining the applicability of the NPM Adjustment. MSA § IX(d)(2)(E).

[3] *See supra* ¶ 14–15. If North Carolina "diligently enforced" its Qualifying Statute, then the Participating Manufacturers are not entitled to the NPM Adjustment.

[4] The State has submitted subsequently decided authority from the North Dakota MSA court, which denied the Participating Manufacturers' Motion to Compel Arbitration and found that the presumption of diligent enforcement was not a "determination" made by the Independent Auditor. *See State ex rel. Stenehjem v. Philip Morris, Inc.*, No. 09-98-C-03778 (N.D. Dist. Ct. July 18, 2006) (order denying motion to compel arbitration). This Court believes the broad language of section XI(c), which includes not only direct challenges to the Independent Auditor's determinations, but also disputes "arising out of or related to" those determinations, mitigates against the result reached by Judge Marquart in North Dakota. As stated above, the Independent Auditor determined that it would not apply the NPM Adjustment. The current dispute over diligent enforcement is clearly "related to" this determination.

[5] To date, the only state court to deny the Participating Manufacturers' Motion to Compel Arbitration is North Dakota. *See supra* note 4. While the Court does not base its decision on the large number of state courts that have compelled arbitration, the Court believes this statistic persuasively demonstrates that the MSA arbitration clause is "susceptible of an interpretation that covers the asserted dispute." *See United Steelworkers*, 363 U.S. at 582–83. For a complete list of decisions entered by other state courts on Defendants' Motion to Compel Arbitration, see Appendices A and B.